Argued July 14, affirmed in part; reversed in part and remanded
December 19, 1978, petition for rehearing denied January 16, 1979

SAKELARIS, *Appellant, Cross-Respondent,*
*v.*
MAYFAIR REALTY, INC.,
*Respondent, Cross-Appellant,*
and
ARMSTRONG, *Respondent.*
(TC A 7603 03651, SC 25336)
588 P2d 23

Robert L. Kirkman, Portland, argued the cause for appellant, cross-respondent. With him on the briefs were Carlton D. Warren, Solomon, Warren, Killeen & Kirkman.

Allen Reel, Portland, argued the cause for respondent, cross-appellant and respondent Armstrong. With him on the brief were Garr M. King, Kennedy, King & McClurg.

Before Holman, Presiding Justice, and Tongue, Bryson and Linde, Justices.

LINDE, J.

**LINDE, J.**

Plaintiff, a real estate broker, brought an action against the corporate defendant and its president, another broker, alleging as one cause of action the breach of a contract to divide a sales commission and, as a second cause of action, tortious interference with plaintiff's contractual rights against the seller in the same transaction. The trial court granted defendants' motion for nonsuit on the tort claim and, at the end of the trial, directed a verdict for plaintiff on the contract claim for the disputed share of the commission. From the resulting judgment, plaintiff appeals with respect to the nonsuited tort claim and the denial of his claim of attorney fees under the contract. Defendant Mayfair Realty cross-appeals with respect to the directed verdict on the contract claim.

The events leading to the dispute involve a number of individuals. Except where noted, the facts are not disputed. Defendant Jack Armstrong was half-owner and president of defendant Mayfair Realty, Inc., which employed Robert Crockett and George Neidhart as salesmen. The transaction giving rise to the disputed commission was the sale of a home owned by Mrs. Eugenia Hubbard to Mr. and Mrs. Bruce Craft. Mrs. Hubbard had given power of attorney to her grandson, Arthur Lewis. In May, 1975, Lewis met with Crockett and gave Mayfair an exclusive listing of the Hubbard property until July 22, 1975. Under the agreement, Mayfair was to receive a ten percent commission if it found a buyer who purchased the property during the life of the agreement or within 90 days of its expiration. Mayfair's advertisement attracted the attention of the Crafts, and Mr. Neidhart, Mayfair's salesman, showed them the property. The Crafts had listed their own home for sale with plaintiff's company, Sakelaris Realty. They asked plaintiff to help them arrange a trade with Lewis rather than an outright purchase, and Neidhart and Sakelaris met at the Craft home to see if this could be accomplished. According to Mr. and Mrs. Craft, Neidhart proposed to Sakelaris that

Mayfair and Sakelaris "co-op", that is to say, divide the commission on the proposed transaction, and Sakelaris agreed. Neidhart prepared a proposed contract of exchange, but Lewis rejected the proposal on July 22. On the same date, the Crafts succeeded in selling their home through Sakelaris and now asked him to assist them in purchasing the Hubbard home. Sakelaris called Crockett to ask if Mayfair would "co-op" the commission on the Hubbard sale and Crockett agreed to do so, as both Crockett and Armstrong testified, without, however, knowing that Sakelaris intended to present an offer by the Crafts. When Sakelaris subsequently did present their proposed earnest money agreement offering $34,000 for the Hubbard home, Crockett expressed surprise at the identity of the purchasers and suggested that the split of the commission might require the decision of Mayfair's president, Armstrong. The testimony conflicts whether the plaintiff was expected to call Armstrong about this question or Armstrong the plaintiff; in any event, no such call was made.

Eventually, after Lewis had rejected this initial purchase offer, Sakelaris on July 25, 1975, prepared and the parties signed a second earnest money agreement for the sale of the property for $35,000. In the space on the printed form provided for the broker's name, plaintiff wrote: "This is a co-op Mayfair/Sakelaris Realty 55/45 split. By Bob Crockett/C. Sakelaris." In a final part of the printed form providing for the "Seller's Closing Instructions," Lewis agreed "to pay forthwith to the above named broker a commission amounting to $3500.00 for services rendered in this transaction." Plaintiff forwarded the completed contract to Mayfair Realty for closing.

Upon receiving this agreement, Armstrong prepared "Broker's Escrow Instructions" to the escrow agent, Transamerica Title Company. His instructions directed the escrow agent to pay Mayfair Realty, Inc., the real estate commission of $3,500, with a second

notation that the commission was to be paid "To MAYFAIR" added in handwriting. Subsequently, the seller's escrow instructions directed Transamerica to pay the commission to "Mayfair Realty, per their letter of instruction." When Transamerica completed the closing on September 11, 1975, it accordingly paid the entire commission to Mayfair, and the present litigation followed.

■ *The contract claim.* Plaintiff alleged the contract said to have been breached by defendants in the following terms:

### V

On or about July 25, 1975, Plaintiff and Defendant agreed to cooperate in the sale of the Hubbard property to Mr. and Mrs. Craft for the purchase price of $35,000.00, which said contract was in writing and provided for $7,000.00 down and the balance of $28,000 to be paid at closing in cash by reason of a loan to be secured by the said parties Craft.

### VI

Under the terms of said agreement, the Seller Hubbard agreed to pay brokerage commissions in the total sum of $3,500.00, which said commissions were agreed between all of said parties to be paid 55% to Defendant MAYFAIR and 45% to Plaintiff SAKELARIS, at closing.

It further alleged that the sale was consummated, the entire commission was paid to defendants, that defendants refused to pay any part of the commission to plaintiff, and that plaintiff was entitled to $1,575 plus interest. Defendants' answer denied any agreement to split the commission and pleaded certain affirmative defenses. There is no dispute that defendants retained the entire commission.

Trial was conducted before a jury. At the end of the trial, the court granted plaintiff's motion for a directed verdict against Mayfair on this cause of action apparently on the theory that as a matter of law, Mayfair's processing of the transaction between the seller and and the buyers constituted an acceptance on its part of the "co-op" terms plaintiff had written into the earnest

[ 585 ]

money agreement. It is clear that the court did not rely on an oral agreement between plaintiff and Mayfair's agents.[1] Defendants argued that no such acceptance could be implied, since Mayfair had an independent obligation to the parties to carry out the sale irrespective of its own concern with the commission. However, the court ruled that "Mayfair Realty, by its actions, accepted, ratified, or confirmed that agreement as between Sakelaris and Mayfair," and that "if they weren't going to accept it, they had to reject it and do so with reasonable dispatch and that was not done."

Mayfair's total course of conduct, after knowledge of plaintiff's cooperation in the transaction and claim to share in the commission, may perhaps give rise to an implied acceptance of the "co-op" arrangement as a matter of fact, but it does not do so as a matter of law. No express assent on behalf of Mayfair appears on the face of the written agreement. Nor did plaintiff plead a claim of "quasi-contract" or a contract "implied in law," that is to say, for a remedy based on nonconsensual premises of quantum meruit or unjust enrichment. Since there is no express acceptance by Mayfair, leaving aside the prior oral discussions with Neidhart and Crockett not relied on by the trial court, the question is whether Mayfair's dealings subsequent to receipt of the July 25 earnest money agreement so unequivocally manifested an acceptance of the "co-op" arrangement written on that document by plaintiff as to leave no issue of fact for a jury. Defendant contends that a jury might well conclude from the testimony of all the circumstances of this transaction that

[1] In ruling on objections to evidence, the trial court took the view that the complaint specified a written contract. Although paragraphs V and VI, quoted above, do not unambiguously state that the agreement "to cooperate in the sale" as well as the sales agreement was in writing, and the court refused to let plaintiff amend his complaint to strike "written agreement," plaintiff does not assign the court's rulings as error.

Some testimony that plaintiff and Crockett on July 22 discussed a proposed "co-op" split of the commission did enter the record and is referred to in defendants' brief. They apparently do not dispute that the conversation took place but that it bound Mayfair. However, the trial court's grant of a directed verdict to plaintiff does not rest on the oral negotiations.

Mayfair's conduct did not necessarily imply any such assent. *Cf. The Oregon Bank v. Baardson,* 256 Or 454, 459-460, 473 P2d 1015 (1970) and *Suitter v. Thompson,* 225 Or 614, 623, 358 P2d 267 (1961). We agree that the question should have been left to the jury, and that it was error to direct a verdict on the first cause of action.

*The tort claim.* In his second cause of action, plaintiff alleged a tortious interference by defendants with his contractual rights in these terms:

### II

By reason of the said written agreement respecting the sale of the Hubbard property to Craft, Plaintiff and Defendants agreed Plaintiff had a direct contractual right to 45% of the said commission from the seller, Hubbard, which said commission was agreed to be paid Plaintiff directly from the escrow agent designated by the parties to close the said sale. Said escrow agent was Transamerica Title Insurance Company.

### III

On or about and between July 25, 1975 and September 19, 1975, Defendants intentionally interfered with the Plaintiff's contractual relationship between Plaintiff and the seller Hubbard. With knowledge and/or notice of the Plaintiff's rights, and said agreement for direct payment of Plaintiff's said commission, Defendants caused the said party Hubbard, and Transamerica Title Insurance Company to breach the said agreements with Plaintiff and pay the entirety of the said commission to Defendants.

The complaint further alleged that plaintiff did not know exactly how defendants caused the seller and the escrow agent to pay plaintiff's agreed share of the commission to defendants but that this was within defendants' knowledge; that defendants intentionally appropriated that share of the commission to themselves; and that they acted willfully and maliciously, entitling plaintiff to punitive damages.

It is undisputed that defendants, with knowledge of plaintiff's asserted claim to divide the commission,

[ 587 ]

instructed the escrow agent to pay the entire commission to Mayfair. Plaintiff also offered evidence from which a jury might have found the elements needed to make an interference with another's contract tortious, if in this case there was such an interference with a separate contract at all.[2] The latter question is the crux of plaintiff's tort claim.

■ The parties are in agreement that a party to a contract cannot be liable for interference with that contract but only for breaching it. In the first cause of action, discussed above, plaintiff had alleged and defendants denied a contract between plaintiff and Mayfair. In the second cause of action, plaintiff pleaded and sought to prove a "direct contractual right to 45% of the said commission from the seller, Hubbard, . . . agreed to be paid Plaintiff directly from the escrow agent," and interference by defendants "with the Plaintiff's contractual relationship between Plaintiff and the seller Hubbard." When it ruled in favor of defendants' motion for nonsuit of plaintiff's tort claim, the trial court took the view that plaintiff could not simultaneously assert an agreement with Mayfair to pay him 45 percent of the commission and an agreement with Lewis to do so, and that defendants could not be liable both for breaching their own agreement and also for interfering as outsiders with an agreement to the same effect between plaintiff and Lewis, acting for Hubbard.[3]

We agree with the trial court. Plaintiff's contention is that the transactions gave rise to a contractual

---

[2] Plaintiff offered testimony by Arthur Lewis that Lewis discussed plaintiff's commission with Crockett after plaintiff became worried about it; that Lewis said he would not close the sale if Mayfair planned not to pay Sakelaris and that he considered bringing the matter to the attention of the Real Estate Commissioner; that Crockett assured him Sakelaris would get a share of the commission, perhaps not the full 45 percent but most of that amount, and that Armstrong wanted to teach Sakelaris a lesson or to "jack him around a little bit." The trial court excluded the testimony, apparently as not being relevant, given the court's view of the dispositive issue.

[3] However, neither defendants nor the court raises any question of election of remedies in this case.

claim on his part against the seller, as recognized in such decisions as *Woodworth v. Vranizan,* 273 Or 111, 539 P2d 1055 (1975) and *Boyce v. Standard Investment Co.,* 263 Or 82, 501 P2d 65 (1972), and that Mayfair tortiously interfered with this contractual claim. It is possible that, as between himself and the seller, plaintiff would have been entitled to collect the portion of the commission he claimed under the earnest money agreement if Mayfair had consented to its share of the alleged "co-op," but it does not follow that Mayfair's disavowal of such an agreement and effort to collect the entire commission is a tortious interference with plaintiff's claim.

■ It is undisputed that Mayfair had an initial exclusive listing agreement promising it a ten percent commission. If it did in fact agree to split this commission with Sakelaris, as we have held above a jury might find, Mayfair would be a party to the contract evidenced by the earnest money agreement. There is no suggestion that Sakelaris displaced or was substituted for Mayfair, only that he entered the relationship as a third participant. On the other hand, as long as Mayfair maintained that it did not agree to split the commission under the circumstances of the sale to the Crafts, it acted to assert contractual claims of its own under its listing agreement—claims which might or might not withstand litigation, but the assertion of which by insisting on the full commission in the escrow agreement is not a tort.

The case is remanded for a new trial on plaintiff's contract claim.

Affirmed in part; reversed in part and remanded.