Argued and submitted September 8, 1994, decision of the Court of Appeals affirmed; judgment of the circuit court affirmed in part and reversed in part, and case remanded to the circuit court for further proceedings September 8, 1995

Jennifer L. McGANTY,
*Petitioner on Review,*

*v.*

Robert L. STAUDENRAUS
and Metropolitan Agencies, Inc.,
*Respondents on Review.*

(CC CV91-357; CA A75978; SC S40963)

901 P2d 841

Gary A. Rueter, of Haugeberg, Rueter, Stone, Gowell & Fredricks, P.C., McMinnville, argued the cause and filed the petition for petitioner on review.

Jeffrey M. Batchelor, of Lane Powell Spears Lubersky, Portland, argued the cause for respondents on review. With him on the response were Paula A. Barran and Jill Goldsmith Dinse.

GRABER, J.

## GRABER, J.

This case involves the requirements for pleading three torts: intentional interference with economic relations, intentional infliction of severe emotional distress, and wrongful discharge. We hold that the trial court did not commit reversible error when it dismissed plaintiff's claim for intentional interference with economic relations, but that it did err in dismissing plaintiff's claims for intentional infliction of severe emotional distress and wrongful discharge.

Plaintiff was an employee of defendant Metropolitan Agencies, Inc., (Metropolitan) a collection agency. Defendant Staudenraus was president of, and an owner of, Metropolitan. He was plaintiff's immediate supervisor.

Plaintiff filed a complaint against Staudenraus and Metropolitan in December 1991. She asserted four claims against both defendants: intentional infliction of severe emotional distress, wrongful discharge, battery, and breach of contract. In addition, against Staudenraus only, she asserted a claim for intentional interference with economic relations.

The underlying factual allegations in the complaint, concerning all five claims, were these:

"From January, 1989, through August 17, 1990, the Defendant Staudenraus, while acting as Plaintiff's supervisor, engaged in a course of conduct constituting a continuing pattern of sexual harassment and abuse of the Plaintiff in the form of unwelcome sexual advances and comments directed at Plaintiff, and physical conduct by rubbing his hands and body against Plaintiff's shoulders, back and buttocks."

Pursuant to ORCP 21 A(8), defendants moved to dismiss the claims for intentional interference with economic relations, intentional infliction of severe emotional distress, wrongful discharge, and breach of contract, on the ground that the complaint failed to state ultimate facts sufficient to constitute those claims. Defendants did not challenge the sufficiency of the claim for battery. The trial court granted defendants' motion as to the tort claims but not as to the

claim for breach of contract. The trial court entered a judgment, pursuant to ORCP 67 B,[1] dismissing plaintiff's claims for intentional interference with economic relations, intentional infliction of severe emotional distress, and wrongful discharge.

Plaintiff appealed. The Court of Appeals held that the trial court erred in dismissing plaintiff's claims for intentional infliction of severe emotional distress and wrongful discharge. *McGanty v. Staudenraus*, 123 Or App 393, 395-97, 859 P2d 1187 (1993). The Court of Appeals held, however, that the trial court's dismissal of the claim for intentional interference with economic relations was proper. *Id.* at 397.

Plaintiff sought review in this court, arguing that she pleaded adequately a claim for intentional interference with economic relations. Defendants sought review of the decision of the Court of Appeals concerning plaintiff's claims for intentional infliction of severe emotional distress and wrongful discharge. We allowed review.[2] We affirm, in part on different grounds.

## INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS

■■ To state a claim for intentional interference with economic relations, a plaintiff must allege each of the following elements: (1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages. *Straube v. Larson*, 287 Or 357, 360-61, 600 P2d 371 (1979); *Wampler v. Palmerton*, 250 Or 65, 73-76, 439 P2d 601 (1968). On review of the

---

[1] ORCP 67 B provides in part:

"When more than one claim for relief is presented in an action, * * * the court may direct the entry of a final judgment as to one or more but fewer than all of the claims * * * only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

[2] Because this case comes to us only on an ORCP 67 B judgment that does not include plaintiff's claims for battery and for breach of contract, those two claims are not before us.

dismissal of this claim pursuant to ORCP 21 A(8), "we accept all well-pleaded allegations of the complaint as true and give plaintiff[] the benefit of all favorable inferences that may be drawn from the facts alleged." *Stringer v. Car Data Systems, Inc.*, 314 Or 576, 584, 841 P2d 1183 (1992).

The dispositive issue in this case concerns the third requirement listed above, the "third-party" element. The Court of Appeals held that plaintiff failed to plead the "third-party" element of the tort of intentional interference with economic relations. *McGanty*, 123 Or App at 397. For the following reasons, we agree.

As this court recognized in *Wampler*, the modern tort of intentional interference with economic relations has deep historical roots. *Wampler*, 250 Or at 72. In *Top Service Body Shop v. Allstate Ins Co.*, 283 Or 201, 204, 582 P2d 1365 (1978), this court explained:

> "Tort claims for wrongful interference with the economic relationships of another have an ancient lineage. Their history has been traced from interference with members of another's household in Roman law or with his tenants in English law, with his workmen after the 1349 Ordinance of Labourers, with prospective workmen or customers, with existing contracts for personal services, and with contracts generally, to contemporary forms not dependent on the existence of a contract. Despite these antecedents, protection in tort against interference with business relations has been described as largely a twentieth century development." (Citations omitted.)

The tort serves as a means of protecting contracting parties against interference in their contracts from *outside* parties. *See Wampler*, 250 Or at 73 ("The interest protected * * * is the interest of the individual in the security and integrity of the contractual relations into which he has entered. Economic relations are controlled by contract and the public also has an interest in maintaining the security of such transactions. Therefore the law provides protection." (footnote omitted)). The tort allows a party to a contract, when that contract is breached by the other contracting (second) party, to seek damages from a third party that induced the second party to breach the contract.

On several occasions, in addressing the third-party element of the tort, this court has stated the general principle that a party to a contract cannot be liable for interference with that contract. *Wampler*, 250 Or at 74-76; *Sakelaris v. Mayfair Realty, Inc.*, 284 Or 581, 588, 588 P2d 23 (1978); *Lewis v. Oregon Beauty Supply Co.*, 302 Or 616, 625-26, 733 P2d 430 (1987). *Wampler* also considered generally the "complicating ingredient [that] is added when the party induced to breach its contract is a corporation and the third person who induces the breach is not a stranger, but is a person who owes a duty of advice and action to the corporation." 250 Or at 74. In that context, the court in *Wampler* said:

"So long as an officer or employe acts within the general range of his authority intending to benefit the corporation, the law identifies his actions with the corporation. In such a situation the officer is not liable for interfering with a contract of the corporation any more than the corporation could be liable in tort for interfering with it. The words 'good faith' should not be employed to render a corporate officer or employe liable for engaging in morally questionable activities upon behalf of his principal that nevertheless would not be tortious if he were acting for himself as the party to the contract.

"The interest protected by the interference with contract action is the interest of the plaintiff in not having his contract rights interfered with by intermeddling strangers. However, so long as the person inducing the breach of a corporate contract is an officer or employe acting for the benefit of the corporation and within the scope of his authority, the plaintiff cannot show that this interest was invaded and therefore *cannot maintain an interference with contract action.*" *Id.* at 76-77 (footnote omitted; emphasis added).

None of our prior cases has analyzed the precise issue that is raised here, however: When (if at all) is an employee, who is alleged to have used improper means to interfere with a contract of the employer, a third party to a contract between the employer and another? This case calls for an analysis of that issue. Staudenraus argues that, even if he used allegedly improper means, he cannot be a third party to the contract between plaintiff and Metropolitan because, according to the complaint, Staudenraus was acting as Metropolitan at all pertinent times. If Staudenraus is not a third party to the contract between Metropolitan and plaintiff, but rather is

acting as a party to the contract between Metropolitan and plaintiff, then Staudenraus cannot be liable for intentional interference with that contract. Therefore, we must consider whether, under the allegations in the complaint, Staudenraus was or was not acting as Metropolitan, his corporate employer.

■ The long-established doctrine of *respondeat superior* provides the appropriate guidance. Under that doctrine, "an employer is liable for an employee's torts when the employee acts within the scope of employment." *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988). The rationale behind the doctrine is that "[w]hen one employs a servant or agent to do his work, the employer is, in the eyes of the law, the actor. The damages caused by the activity are the master's responsibility, so long as it is the master's business that is being done." *Gossett v. Simonson*, 243 Or 16, 23, 411 P2d 277 (1966). From those cases, it follows that, when an employee is acting in the scope of the employee's employment, the employee is acting as the employer, and not as an independent entity. Accordingly, when an employee is acting within the scope of the employee's employment, and the employer, as a result, breaches a contract with another party, that employee is not a third party for the tort of intentional interference with economic relations.

■ In the present case, plaintiff alleged in the claim for intentional interference with economic relations:

> "*At all times* material hereto, *Defendant* Robert L. Staudenraus was and is the President and an owner and employee of Metropolitan Agencies, and *was acting within the course and scope of his employment*." (Emphasis added.)

This court previously has held that "[a] statement of fact in a party's pleading is an admission that the fact exists as stated." *Moore v. Drennan*, 269 Or 189, 193, 523 P2d 1250 (1974). Accordingly, plaintiff's allegation that "[a]t all times * * * Staudenraus * * * was acting within the course and scope of his employment" is an admission that the described fact exists as stated. Plaintiff does not ask for relief from the effect of her admission; indeed, before the trial court, she declined to plead this claim over to remove the scope of employment allegation. *See Yates v. Large*, 284 Or 217, 223, 585 P2d 697 (1978) (a trial court may relieve a party from the

effect of an admission in a pleading by allowing amendment of the pleading). Moreover, in no other part of her claim does plaintiff allege, either directly or by implication, that Staudenraus ever acted outside the scope of his employment when he allegedly committed the acts that interfered with plaintiff's economic relations with Metropolitan. Therefore, we give effect to plaintiff's allegation that Staudenraus was, at all times, acting within the scope of his employment.[3]

■ Plaintiff's admission that, at all material times, Staudenraus was acting within the scope of his employment disposes of plaintiff's claim. It does so because it establishes, consistent with *Chesterman*, that the alleged acts occurred substantially within the time and space limits authorized by the employment, that Staudenraus was motivated, at least in part, by a purpose to serve the employer, and that the alleged acts were of a kind that Staudenraus was hired to perform. *See Chesterman*, 305 Or at 442 (stating requirements to conclude that an employee was acting within the course and scope of the employee's employment). Plaintiff's admission thus establishes that Staudenraus was not a third party to the contract between plaintiff and Metropolitan. Plaintiff has failed to satisfy the third-party element of the tort. That being so, defendant Staudenraus cannot be liable for intentional

---

[3] This court has stated:

"Three requirements must be met to conclude that an employee was acting within the scope of employment. These requirements traditionally have been stated as: (1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform." *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988) (citations omitted).

That standard is the appropriate one for determining whether a party has acted within the scope of employment for the purpose of this tort.

Normally, whether a party has acted within the scope of employment is a question of fact, albeit an ultimate fact. *See Stanfield v. Laccoarce*, 284 Or 651, 655, 588 P2d 1271 (1978) (normally, question whether an employee has acted within the scope of employment is a question of fact for the jury). Because plaintiff has admitted that Staudenraus was acting within the course and scope of his employment, we accept that allegation (consistent with the rule in *Moore*, 269 Or at 193) as an admission that that fact exists as stated. Plaintiff argues that we should construe that allegation, along with others in the complaint, in her favor as the pleader. Because nothing in the complaint qualifies that allegation or makes it ambiguous, however, we have no occasion to construe plaintiff's admission.

interference with the economic relations between plaintiff and Metropolitan.[4]

Notwithstanding the precedents discussed above, plaintiff argues that the allegation that Staudenraus acted within the course and scope of his employment does not dispose of her claim. Plaintiff reasons that, when Staudenraus engaged in a pattern of sexual harassment, he used "improper means" while acting on behalf of Metropolitan. What plaintiff argues is that her complaint states a claim for this tort, because she alleges mixed purposes; "an allegation of mixed *motives* creates a jury question." (Emphasis in original.) Under plaintiff's theory, although the allegation that Staudenraus acted within the scope of his employment would dispose of any claim that plaintiff acted with an improper *purpose* when he allegedly harassed plaintiff, that allegation should not dispose of plaintiff's claim if she can prove that Staudenraus used improper *means*.

■ That argument is not well taken. Whether a party has acted by either an improper means or with an improper purpose is relevant, under the fourth element of the tort, *only* if that party first meets the threshold test of being a third party to the contractual relationship with which the interference allegedly has occurred.

Plaintiff's argument is not surprising, however. Three of this court's prior cases — *Straube, Welch v. Bancorp Management Services*, 296 Or 208, 675 P2d 172 (1983), *modified on recons* 296 Or 713, 679 P2d 866 (1984), and *Lewis* — have not been entirely clear respecting the distinction between the third-party element of the tort and the improper means/improper purpose element of the tort.[5] In all

---

[4] The parties disagree about whether the plaintiff or the corporate-agent defendant ordinarily bears the burden of pleading, and of proving, that the defendant agent was or was not acting within the scope of the agent's employment. We need not decide that question of allocation of the burden of pleading or proof because, in this case, plaintiff affirmatively pleaded facts demonstrating that defendant Staudenraus cannot be liable for intentional interference with economic relations.

[5] The first of this court's cases to address extensively the improper means/improper purpose element of the tort was *Top Service Body Shop v. Allstate Ins Co.*, 283 Or 201, 582 P2d 1365 (1978). In *Top Service*, the plaintiff, an automobile body repair shop, brought an action against the defendant insurance company on the theory that the defendant had tortiously interfered with the plaintiff's business by directing insurance claimants to have repairs made at other body shops. The trial

three of those cases, this court has considered whether a corporate agent could be liable for interfering with a corporation's contract with a third party. In none of those cases did the court's resolution of the issue involve addressing the third-party element of the tort, however.

In *Straube*, the plaintiff, a physician who was employed by a hospital, sued the hospital's chief administrator and a hospital resident, among others, for interfering with the plaintiff's employment relationship with the hospital by causing his temporary suspension from the hospital staff. That case came before the court after a summary judgment had been entered for the defendants. 287 Or at 359. The defendants argued that the grant of summary judgment was proper because, as hospital employees who owed a duty of care to the hospital and its patients, they were justified or "privileged" to interfere with the interests of the hospital and the public. The court rejected that argument and stated that the defendants could be liable for interference if they caused the plaintiff's suspension from employment either with an improper purpose or though improper means. *Id.* at 369-71.

In reaching that conclusion, the court stated:

> "*The issue is whether the evidence demonstrates that the actions of [defendants] were taken for the benefit of the hospital or whether they were taken to satisfy private grudges.* We submit that the evidence * * * creates a question of fact on this issue, and there is no basis for justification or privilege as a matter of law unless there is an absolute privilege." *Id.* at 370 (emphasis added).

---

court granted the defendant's motion for a judgment notwithstanding the verdict, and the plaintiff appealed. 283 Or at 203. In the circumstances, the court did not need to analyze the relationships among the parties to determine whether the defendant was a third party to the contract; *Top Service* was a case in which "the person interfering is a complete stranger to the contractual relationship." *Wampler*, 250 Or at 74.

In *Top Service*, the court held that a third party's liability for intentional interference with economic relations may arise either "from improper motives or from the use of improper means." 283 Or at 209. The court affirmed the judgment of the trial court as to that claim. *Id.* at 216. *Top Service* stands for the proposition that there are two different ways for a plaintiff to show that the tort has occurred — either through means or purpose. That case does not stand for the proposition that a plaintiff may establish that a party who is *not* a third party to the contract may be liable for intentional interference with economic relations simply because that party has acted by improper means or with an improper purpose.

Nothing in that passage conflicts with our holding today. In *Straube*, the court found that there was sufficient evidence in the record to create a question of fact as to the third-party element of the tort. Because the evidence in the record on summary judgment created a question of fact as to whether the defendants had acted to benefit the hospital (and thus were within the scope of their employment) or whether the defendants acted to satisfy a personal grudge (and thus were acting outside the scope of their employment), plaintiff was entitled to proceed with his case and try to show that defendants were third parties to the contract and, as such, had interfered with his contract with the hospital either with an improper purpose or through improper means.

*Welch* involved a loan agreement between the plaintiff, a real estate developer, and a bank. The plaintiff alleged that agents of the bank had advised the bank to breach the loan agreement. The developer sued the agents for intentional interference with the loan agreement, arguing that the agents interfered, for an improper purpose, with the developer's contract with the bank. The trial court granted summary judgment to the defendants, and the plaintiff appealed. 296 Or at 210-12.

The court upheld the trial court's grant of summary judgment on plaintiff's theory of an improper purpose. The court reasoned that, because the agents were acting, at least in part, "within the scope of [their] authority and with the intent to benefit the principal," their purpose could not be improper. *Id.* at 216-17. The court did not address whether the bank's agents were "third parties" to the relationship between the bank and the developer. The court did not need to consider that issue to dispose of the case because, even if the defendants were third parties to plaintiff's contract with the bank, the defendants could not be liable.

On reconsideration, the court noted that its earlier decision regarding allegedly improper purpose did not address the agents' potential liability for interfering through improper means. 296 Or at 715-16. The court concluded that a question of fact existed on that issue and remanded the claim to the trial court. *Id.* at 716-17. Nothing in the discussion of *Welch* on reconsideration suggests that the record showed that the defendants were acting within the scope of

their employment when they committed the allegedly tortious acts by improper means. *Welch* simply did not address the issue that we decide today.

Finally, in *Lewis*, this court affirmed a verdict against a corporate supervisor for interference with the plaintiff's employment relationship with the corporate employer; the record showed that he had harassed the plaintiff until she quit. 302 Or at 621-22. The court considered whether the evidence disclosed that the supervisor's interference was accomplished either with an improper purpose or through improper means. *Id.* at 621-23. The court concluded that the supervisor's harassment of the plaintiff amounted to improper means. *Id.* at 622-23. Again, however, the court did not discuss the third-party element and did not consider whether the supervisor was acting within the scope of his employment when he interfered with the plaintiff's contract with the corporate employer.

In summary, we hold that, when an employee acts within the scope of employment, that employee is not a third party to a contract between the employer and another for the purpose of the tort of intentional interference with economic relations. Plaintiff alleged that Staudenraus was acting at all relevant times in the scope of his employment by Metropolitan. Accordingly, we hold that the trial court did not err in dismissing plaintiff's claim against Staudenraus for intentional interference with economic relations.

## INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS

A claim for intentional infliction of severe emotional distress contains these elements:

> "To state a claim for intentional infliction of severe emotional distress, a plaintiff must plead that (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *Sheets v. Knight*, 308 Or 220, 236, 779 P2d 1000 (1989).

Prior decisions by this court have held that, to satisfy the intent element of this tort, a plaintiff must allege that the

defendant acted with the purpose of inflicting severe emotional or mental distress on the plaintiff. "It is not enough that [the defendant] intentionally acted in a way that causes such distress." *Patton v. J. C. Penney Co.*, 301 Or 117, 122, 719 P2d 854 (1986). *See also Sheets*, 308 Or at 236 (stating same principle).

■ Plaintiff alleged only that defendants' *acts* were intentional and that defendants "knew or should have known" that their acts would cause severe emotional distress. Plaintiff did not allege that defendants' conduct was undertaken for the purpose of inflicting severe emotional distress.

Plaintiff acknowledges that she did not plead the level of intent required by *Patton* to sustain this tort claim.[6] She argues, however, that a reduced level of intent applies when an employee sues an employer. Plaintiff also argues that, in recent cases, this court has erroneously described the level of intent that applies to this tort generally. We agree with the second argument.

This court first recognized the tort of "outrageous conduct" — the predecessor to intentional infliction of severe emotional distress — in *Pakos v. Clark*, 253 Or 113, 453 P2d 682 (1969). In that case, the court adopted the definition of

---

[6] The Court of Appeals held that "[p]laintiff has pleaded facts that, if true, are sufficient to show that defendants specifically intended to cause her severe emotional distress." 123 Or App at 395-96 (footnotes omitted). Thereafter, the parties moved jointly for reconsideration, a motion that the Court of Appeals denied. In that joint motion, which plaintiff's counsel signed, the parties asserted in part that they "agree that plaintiff's complaint did not allege that defendants actually intended to cause severe emotional distress" and that her "complaint was purposely meant to allege something less" — *i.e.*, "that defendants acted volitionally with knowledge that the acts would cause the distress."

Assuming that the Court of Appeals drew permissible inferences from the complaint as written, plaintiff nonetheless will be held to the assertion of what she believes that she can prove. *See Sadler v. Sisters of Charity*, 247 Or 50, 51 n 1, 426 P2d 747 (1967) (a trial court properly granted the defendant's motion for an involuntary nonsuit after counsels' opening statements in an action for personal injuries; "Plaintiff's counsel commendably stated that his opening statement was as favorable a statement of his client's claim as he could hope to establish by the evidence."); *Norris and Norris*, 302 Or 123, 125, 727 P2d 115 (1986) ("it has long been the rule in Oregon that 'when the facts are stipulated *the court is bound by them*' * * *. It is not the courts' function to require the parties to contend over facts about which they are agreed" (emphasis in original; citation omitted)). Plaintiff has made an admission in this case that is similar to the one that this court relied on in *Sadler*.

the tort used in the Restatement (Second) of Torts § 46 (1965). 253 Or at 122-32. The court held that the alleged conduct of a police officer, who told the defendant that he was "crazy as a bedbug" and that the officer was going to put the defendant in an insane asylum and take away his children, and similar conduct by other employees of Multnomah County Sheriff's Office, did not constitute extreme and outrageous conduct. 253 Or at 132.

In *Rockhill v. Pollard*, 259 Or 54, 55, 485 P2d 628 (1971), the court reaffirmed the decision in *Pakos* to adopt Restatement § 46. The court in *Rockhill* also addressed what is now the third element of the tort of intentional infliction of severe emotional distress — whether the defendant engaged in conduct that would be considered an extraordinary transgression of the bounds of socially tolerable conduct. *Id.* at 59-64. As to that conduct element, the court stated that "[a]n important factor to consider * * * is the particular relationship between the parties." *Id.* at 60. The court held that the relationship between the parties, as patient and doctor, should be considered *"in deciding what behavior may be found to be extreme or outrageous." Id.* at 63 (emphasis added).

In *Rockhill*, the court drew a distinction between the necessary *intent* needed to sustain a claim for outrageous conduct and what type of *conduct* will be considered outrageous. The "special relationship" discussion applied only to the conduct element of the tort, not to the intent element.

In *Turman v. Central Billing Bureau*, 279 Or 443, 568 P2d 1382 (1977), the next case from this court to address the tort of intentional infliction of severe emotional distress, the plaintiff sued the defendant collection agency to recover damages that resulted from the defendant's collection tactics. 279 Or at 445. The court held that evidence offered concerning the actions of the collection agency were sufficient to state a claim. *Id.* at 448-49. The court did not discuss intent. Neither did the court address the relationship between the parties, except to note that the Restatement of Torts (Second) § 46, comment *e,* stated that collecting creditors, as well as police officers, school authorities, and landlords, have been held liable for the tort of outrageous conduct. *Id.* at 446.

The next case involving this tort was *Brewer v. Erwin*, 287 Or 435, 600 P2d 398 (1979), an action by a tenant against a landlord. The tenant alleged that the landlord engaged in outrageous behavior sufficient to state a claim for intentional infliction of severe emotional distress. 287 Or at 454. The court in *Brewer* engaged in the following discussion of the prior cases:

> "The premise of *Turman* differs from that of *Rockhill* because in *Turman* the very purpose of defendant's conduct was to inflict psychological and emotional distress on plaintiff. Defendant's agents did so intentionally, not from any sudden ill temper or dislike of plaintiff, whom they apparently did not know, but as a device for their own objectives. This places *Turman* within a well recognized line of cases involving personally abusive business tactics by insurance adjusters, collection agencies, or other creditors, mostly against inexperienced and vulnerable individuals. Such an intent was not charged against the physician in the earlier case, whose conduct the court [in *Rockhill*] thought a jury might find 'wilfully or recklessly' in default of his professional duty to plaintiffs.
>
> "The cause of action recognized in *Turman* is an intentional tort. Its essence is that the infliction of actual mental suffering on the plaintiff is the deliberate purpose of defendant's conduct, although that conduct may of course have an ulterior objective, as in *Turman*. Such a purpose is itself wrongful in the absence of some privilege or justification. * * * When the wrongful purpose is lacking, on the other hand, the tortious element can be found in the breach of some obligation, statutory or otherwise, that attaches to defendant's relationship toward plaintiff, as in *Rockhill v. Pollard, supra*, and as has long been imposed on innkeepers, public carriers, and the like. *This court has not had occasion to consider whether in the absence of such a relationship a recovery for solely emotional distress can be based on a defendant's conduct, not otherwise tortious, that a jury may find to be beyond the limits of social toleration, though the conduct is not deliberately aimed at causing such distress but only reckless of the predictable effect.*" *Id.* at 457-58 (footnotes omitted; emphasis added).

The court concluded that it need not consider that question in *Brewer*, because the "defendants engaged in abusive conduct that was deliberately designed to frighten or otherwise distress plaintiff into abandoning the premises and that went

beyond the outer limits of what a reasonable person in plaintiff's position" would be expected to tolerate. *Ibid.*

As the quoted passage makes clear, the court in *Brewer* blurred the intent and conduct elements of the tort. The passage easily could be read to mean that the court effectively added a *purpose* requirement to the intent element of the tort, except when a "special relationship" existed between the parties.

That reading is at odds with the court's decision in *Turman*, but *Brewer* did not purport to modify *Turman* expressly. As discussed above, the court in *Turman* was concerned with whether the defendant's *conduct* was outrageous, not with whether the defendant engaged in such conduct with the *purpose* of causing severe emotional distress to the plaintiff. The court in *Turman* looked to the relationship between the parties to determine what the bounds of socially acceptable behavior were between the parties, *not* to determine what the defendant's purpose was when it intentionally engaged in such behavior. The court erred in *Brewer* when it read *Turman* as adding a purpose requirement to the intent element of the tort of intentional infliction of severe emotional distress.

*Hall v. The May Dept. Stores*, 292 Or 131, 637 P2d 126 (1981), was the next case from this court that considered the tort of intentional infliction of severe emotional distress. *Hall* involved a claim brought by a store's former employee, for intentional infliction of severe emotional distress allegedly suffered after the employee was questioned by the store's security personnel about shortages in a cash register. 292 Or at 134. In that case, the court was concerned primarily with whether the defendant's acts constituted the type of conduct that is outside the bounds of socially tolerable behavior. *Id.* at 135-42. However, the court also addressed the intent element of the tort. *Id.* at 137. In discussing prior decisions concerning the tort of intentional infliction of severe emotional distress, the court made the following statement:

> "These cases show that there are at least three distinguishable issues facing a trial court in a case like the present. The first is whether the relationship between a defendant and the victim of the alleged tort is one that imposes on the

defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers. The character of the relationship bears on the mental element required to impose liability, *compare Rockhill*, with *Turman* and *Brewer*, and also on the next issue, the offensiveness of conduct that crosses the threshold of potential liability, *see Pakos v. Clark, supra." Ibid.*

As that passage makes clear, the court in *Hall* reiterated the error made in *Brewer*, by asserting that this court's cases had held that the nature of the relationship between the parties has some bearing on the level of intent required to impose liability for the tort. Again, the court's reliance on *Pakos, Rockhill, Turman*, and *Brewer* was misplaced. As discussed above, in none of those cases did the decision turn on whether the relationship between the parties affected the *level of intent* required to establish liability. Rather, all those cases decided whether the nature of the relationship between the parties had affected what type of *conduct* would be actionable.

Similarly, in *Hall*, the court's holding turned on whether the defendant's actions were outside the bounds of socially acceptable behavior, considering the relationship between the parties. The court stated:

"We focus particularly on whether the jury could find that [the defendant] attempted to threaten and frighten plaintiff as a deliberate tactic even though he knew that he did not have convincing evidence of misconduct on her part. * * *

"* * * * *

"* * * [A] jury could decide that defendants' method of interrogation was an extraordinary transgression of contemporary standards of civilized conduct toward an employee." 292 Or at 139-41.

Accordingly, the court affirmed the jury's verdict in favor of the plaintiff. *Id*. at 141-42.

In four employment-related decisions following *Hall*, this court restated that the level of intent required to establish a claim for intentional infliction of emotional distress contained a purpose requirement. *See Madani v. Kendall Ford, Inc.*, 312 Or 198, 204, 818 P2d 930 (1991) ("The only relevant intent in the tort of intentional infliction of

severe emotional distress is, as plaintiff pleaded, the 'inten[t] to cause * * * plaintiff severe emotional distress.' " *Sheets*, 308 Or at 236, (intent to inflict severe emotional distress is one of the elements of the tort); *Lewis*, 302 Or at 626 (same); *Patton*, 301 Or at 122 (same).

In three of those four cases, the court did not apply the erroneous intent standard in reaching its conclusion and mentioned that standard only in passing. *See Madani*, 312 Or at 204-06 (court dismissed the plaintiff's claim for intentional infliction of severe emotional distress because the defendant's acts, as pleaded by the plaintiff, did "not transgress the bounds of socially tolerable behavior"); *Lewis*, 302 Or at 627-28 (same); *Patton*, 301 Or at 124 (same). The fourth case, *Sheets*, contained a fuller discussion:

> "The plaintiff must allege that the defendant specifically intended to cause severe emotional distress. It is insufficient merely to allege that the defendant intentionally acted in a way that caused severe emotional distress. In *Patton* we held that a discharge from employment, without more, did not amount to an extraordinary transgression of the bounds of socially tolerable behavior.

> "The plaintiff here fails to allege that the defendant * * * acted with the specific intent to inflict severe emotional distress. Likewise, an allegation that the defendant acted out of vengeance or because of embarrassment is inadequate because it does not assert that the defendant sought to inflict severe emotional distress." 308 Or at 236 (citation omitted; footnote omitted).

In that passage from *Sheets*, the court again blurred the distinction between the intent element of the tort and the conduct element of the tort. Thus, the court reiterated the mistake made in *Brewer* and expounded in *Hall*.

To summarize, several recent decisions of this court have misconstrued the intent element of the tort of intentional infliction of severe emotional distress by requiring that a defendant have acted with the *purpose* of inflicting severe emotional distress on a plaintiff. That misconstruction began with the court's decision in *Brewer*, which misread precedent. Because of that erroneous interpretation of law, we now will reconsider the common law rule concerning the level of intent

required to establish intentional infliction of severe emotional distress. *See Heino v. Harper*, 306 Or 347, 373-74, 759 P2d 253 (1988) (stating circumstances under which this court will reconsider a court-created rule or doctrine).

The Restatement (Second) of Torts § 8A (1965) defines the element of "intent," with respect to intentional torts generally, as follows:

> "The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."

Comments *a* and *b* provide further guidance:

> "*a.* 'Intent,' as it is used throughout the Restatement of Torts, has reference to the consequences of an act rather than the act itself. When an actor fires a gun in the midst of the Mojave Desert, he intends to pull the trigger; but when the bullet hits a person who is present in the desert without the actor's knowledge, he does not intend that result. 'Intent' is limited, wherever it is used, to the consequences of the act.

> "*b.* All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."

Comment *i* of the Restatement (Second) of Torts § 46 (1965), defining intentional infliction of severe emotional distress, explains the element of intent in the specific context of this tort. "The rule stated in this Section applies *where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct*." (Emphasis added.)[7]

---

[7] Prosser and Keeton reach a similar conclusion.

"Much of the confusion surrounding application of the legal requirement of intent arises from a lack of clear understanding of the relationship between act, intent, and motive.

"* * * * *

"* * * [I]ntent is broader than a desire or purpose to bring about physical consequences. It extends not only to those results which are desired, but also to

Consistent with the *Pakos* court's intention of adopting in Oregon the Restatement's rule, we adopt that definition of intent. Next, we apply that standard to the present case. Plaintiff alleged that "Defendants' conduct was intentional and voluntary and Defendants knew or should have known that their actions would cause severe * * * distress." The allegation that "defendants acted volitionally with knowledge that the acts would cause severe emotional distress" is sufficient to establish intent as that term is used in the Restatement (Second) of Torts §§ 8A and 46, and as that term was intended to be applied by this court in *Pakos*.

Plaintiff pleaded the requisite intent to establish a claim for intentional infliction of severe emotional distress. Therefore, the trial court erred in dismissing that claim.

## WRONGFUL DISCHARGE

Plaintiff also alleges that defendants' actions resulted in her wrongful discharge. To allege a claim of wrongful discharge "there must be a discharge, and that discharge must be 'wrongful.' " *Moustachetti v. State of Oregon*, 319 Or 319, 325, 877 P2d 66 (1994). In the present case, the parties do not dispute that plaintiff's allegations meet the "wrongfulness" prong of that formulation. Rather, the question at hand relates to the pleading of the "discharge" prong.

"The legal 'injury' alleged in an action for a wrongful discharge is *the discharge*." *Moustachetti*, 319 Or at 325 (emphasis in original). In *Sheets*, the court held that a discharge can be either actual, as when an employer tells an employee "you're fired," or constructive, as when an employer tells an employee "quit, or you'll be fired." 308 Or at 226-28. In reaching that conclusion, the court noted that "it would defy both reason and fairness to hold liable an employer who wrongfully discharges an employee but to immunize from liability an employer who, for equally improper reasons, induces an employee to resign rather than be fired." 308 Or at 228.

---

those which the actor believes are substantially certain to follow from what the actor does. The actor who fires a bullet into a dense crowd may fervently pray that the bullet will hit no one, but if the actor knows that it is unavoidable that the bullet will hit someone, the actor intends that consequence." W. Page Keeton (Ed.), *Prosser and Keeton on the Law of Torts*, § 8, at 34-35 (5th ed 1984) (footnote omitted).

In *Bratcher v. Sky Chefs, Inc.*, 308 Or 501, 783 P2d 4 (1989), this court addressed the following question, certified from the United States District Court for the District of Oregon: "Does Oregon recognize the tort of wrongful constructive discharge?" 308 Or at 503. The court questioned that phrasing as well as the suggestion that " 'wrongful constructive discharge' is a 'doctrine.' " *Id.* at 504. Rather, the court reasserted that there is, in Oregon, a tort of wrongful discharge, and that a discharge can be constructive. *Id.* at 503. The court then held that "a resignation caused by unacceptable working conditions can be a constructive discharge." *Id.* at 504.

In reaching that holding, the court stated:

"In every action for wrongful discharge, it must be shown that the plaintiff was *discharged*. Whether the discharge be direct ('You're fired!') or less direct ('I'll make things so miserable for you that you'll be forced to leave!'), *the employer's intent is relevant and important. The employer seeks to dismiss an employee.* If an employer is seeking to accomplish indirectly what could not be done directly, that can and should be shown. Employers who tell an employee, 'Resign or be fired' may be found to have discharged an employee. Similarly, an employer who decides, 'I'll make things so miserable that you'll quit' may be found to have discharged an employee. Because the latter is the substantial equivalent of the former, the employer's intent in creating or permitting the conditions is key.

"The heart of the relevant *Sheets v. Knight* analysis was that an employer 'discharges' an employee when the employer makes a unilateral decision to terminate the employee's employment, even though the employer invites or permits the employee to quit instead. The employer's unilateral decision to dismiss the employee is the essence of the discharge, even if the employee's resignation avoids an actual formal dismissal.

"Where the claim is that the employee was forced to quit because of unacceptable working conditions created or maintained by the employer, here, too, it is consistent and appropriate to require that the plaintiff prove that the employer did so deliberately to get rid of the employee. We therefore conclude that in order to have a constructive discharge because of unacceptable working conditions, the employee

must show that the employer deliberately created or maintained the working conditions *with the purpose of forcing a resignation*.

 "* * * * *

"In sum, to establish a constructive discharge stemming from unacceptable working conditions, a plaintiff must prove (1) that the employer deliberately created or deliberately maintained the working condition(s) (2) *with the intention of forcing the employee to leave the employment*, and (3) that the employee left employment because of the working conditions." *Id.* at 505-07 (footnote omitted; citations omitted; first emphasis in original; other emphasis added).

That passage from *Bratcher* makes clear that the court construed the element of "intent," with respect to determining whether a constructive discharge has occurred, to contain a purpose component.

■ In this case, plaintiff alleged in her complaint that defendants "knew or should have known" that their intentional conduct would force her to resign and that defendants' conduct left plaintiff with no reasonable choice but to resign from her job. Plaintiff did not allege that defendants' purpose in engaging in such conduct was to force her to resign. The trial court dismissed the claim for wrongful discharge. The Court of Appeals held that the facts alleged in plaintiff's complaint stated a claim and permitted an inference of such intent. 123 Or App at 397 n 3.

As noted above, after the Court of Appeals issued its decision below, the parties moved jointly for reconsideration. In that motion, signed by plaintiff's counsel, the parties asserted in part:

"The parties agree that plaintiff's complaint did not * * * allege that defendants intended by their actions to force plaintiff to quit.

"Plaintiff's complaint was purposely meant to allege something less than the specific intent [to force plaintiff to resign,] described in the [Court of Appeals'] opinion, and this was understood by the trial judge and all parties to the case. * * *

"The parties disagree on the consequences that flow from what plaintiff has alleged, but they do not propose to reargue their briefs here. They only wish to point out that the court's

decision is based upon an incorrect factual premise regarding plaintiff's complaint. The parties therefore jointly ask the [C]ourt [of Appeals] to reconsider its opinion and decide the case on the basis of the allegations in the complaint * * * *that defendants acted volitionally with knowledge that the acts would cause * * * resignation.*

"* * * If [reconsideration] is denied, * * * the complaint will be amended to reflect what *plaintiff in good faith believes she can prove*, which is *something less than the specific intent [to force plaintiff to resign]*. If that does not state a claim, plaintiff would prefer to know that now." (Emphasis added.)

We will decide the case on the basis of the statement of plaintiff's counsel as to the facts that she can prove. *See Sadler v. Sisters of Charity*, 247 Or 50, 51 n 1, 426 P2d 747 (1967) (motion for involuntary nonsuit decided on basis of facts asserted by the plaintiff's counsel in opening statement, where counsel made it clear that statement was the most favorable version that the plaintiff could prove). In other words, we will decide whether it is enough that defendants acted volitionally with knowledge that their acts were certain or substantially certain to cause resignation, but *without* the purpose of forcing plaintiff to resign.

In her written arguments, plaintiff asks this court to retreat from the requirement, stated in *Bratcher*, that an employer have the purpose of forcing the employee to resign. Plaintiff asks this court to hold instead that a plaintiff states claim by alleging that "working conditions became intolerable as a result of the sexual harassment and abuse she was forced to endure in the workplace." For the reasons discussed below, we agree with plaintiff's argument that this court should retreat from the requirement stated in *Bratcher*, although we decline to adopt plaintiff's formulation.

As the above-quoted passage illustrates, the court in *Bratcher* freely interchanged the words "intent" and "purpose" in delineating what constitutes a constructive discharge. Our discussion of the "intent" element of the tort of intentional infliction of severe emotional distress illustrates, however, that there is a distinction between engaging in conduct with a given "intent" and engaging in conduct with a given "purpose." 321 Or at 543-51. The two terms are not synonymous. Intent, in the context of proving an intentional

tort, generally is broader than a purpose to bring about a specific result. As our discussion also makes clear, this court previously blurred that distinction in *Sheets*. *Id.* at 549.

In view of the *Bratcher* court's reliance on *Sheets*, and in view of the *Bratcher* court's blurring of the distinction between purpose and intent, we now hold that the court erred when it held that a plaintiff must show, to establish a constructive discharge, that an employer acted with the purpose of forcing the employee to resign. That one aspect of the *Bratcher* opinion was inadequately considered when it was decided, and we will no longer adhere to it. *See Heino*, 306 Or at 373-74 (stating circumstances under which this court will reconsider a court-created rule or doctrine).

 We next consider what the rule ought to be instead. Ordinarily, an alleged tortfeasor acts intentionally when the tortfeasor "desires to cause [the] consequences of his act, or * * * believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts § 8A (1965). If the "actor knows that the consequences [of the act] are certain, or substantially certain, to result from [the] act, and still goes ahead, [the actor] is treated by the law as if [the actor] had in fact desired to produce the result." *Id.* at comment *b*. We adopt the foregoing definition of intent, because it is consistent with the reasons for which this court originally recognized that a discharge, for the tort of wrongful discharge, may be either constructive or actual. *See Sheets*, 308 Or at 227 (reason for recognizing constructive discharge in the tort of wrongful discharge is to avoid "exalt[ing] form over substance" and "allow[ing] employers * * * to escape liability if their conduct was otherwise improper").

 In *Bratcher*, the court concluded that it need not decide whether an employee alleging a constructive discharge must show "that the employee quit because of working conditions that were unacceptable to the employee (which, as stated, is a subjective test) or whether the employee must show that a reasonable person in the employee's position would consider the working conditions so unacceptable as to force a resignation." 308 Or at 506. The court observed that such a discussion was unnecessary because of the purpose requirement. Because the employee had to show that the employer *meant* to fire the employee, it was irrelevant what

some hypothetical employee would do in some other hypothetical setting. *Ibid.* However, because we have decided to modify the intent element when the tort of wrongful discharge involves a constructive discharge, we must decide the question that the *Bratcher* court avoided. For the following reasons, we now hold that an objective inquiry must be made to determine whether working conditions imposed by an employer are so intolerable as to force a resignation.

An objective test preserves the requirement that there be a discharge, before there can be a wrongful discharge. If an employee chooses to quit because of objectively *tolerable* working conditions, it cannot fairly be said that the employer has "induce[d the] employee to resign rather than be fired." *Sheets*, 308 Or at 228. Objectively tolerable working conditions simply are not an inducement to resign.

It also bears noting that the courts in other jurisdictions have adopted the objective test for constructive discharge cases. In the federal circuit courts, plaintiffs alleging a constructive discharge in violation of a variety of statutes must show that a reasonable person would have found the working conditions complained of intolerable. *See, e.g., Berger v. Edgewater Steel Co.*, 911 F2d 911, 922-23 (3d Cir 1990) (applying reasonable person test to alleged constructive discharge in violation of Employee Retirement Income Security Act, 29 USC § 1140), *cert den* 499 US 920 (1991); *Simpson v. Federal Mine Safety & Health Rev. Com'n*, 842 F2d 453, 461-63 (DC Cir 1988) (applying reasonable person test to alleged constructive discharge in violation of the Mine Act, 30 USC § 815(c)(1)); *Jett v. Dallas Independent School Dist.*, 798 F2d 748, 754-55 (5th Cir 1986) (applying reasonable person test to action brought under 42 USC §§ 1981 & 1983 for alleged constructive discharge in violation of federal constitutional due process, equal protection, and First Amendment rights), *aff'd in part and rem'd in part on other grounds*, 491 US 701, 109 S Ct 2702, 105 L Ed 2d 598 (1989). *See also* Comment, *Constructive Discharge Under Title VII and the ADEA*, 53 U Chi L Rev 561, 569 (1986) (in the federal circuit courts, a "plaintiff must demonstrate that a reasonable person would have found the working conditions intolerable," regardless of what other criteria each circuit court may apply in finding a constructive discharge); Paul H. Tobias,

2 *Litigating Wrongful Discharge Claims* § 7:35, 103 (1991) ("Common to each of the standards employed by the federal courts [to determine whether a constructive discharge has occurred] is the requirement that working conditions be sufficiently intolerable that a reasonable person in the position of the employee would have felt objectively compelled to resign."). Similarly, most state courts have embraced a reasonable-person standard for establishing that working conditions were so intolerable as to constitute a wrongful discharge. *See* Tobias at § 7:36 ("[m]ost [states] require at least an objective showing that * * * a reasonable person would have felt compelled to resign under the circumstances"). Although, of course, we are not bound by those decisions, we find their reasoning and consistency on this point convincing.

In sum, to establish a constructive discharge, a plaintiff must allege and prove that (1) the employer intentionally created or intentionally maintained specified working condition(s);[8] (2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them; (3) the employer desired to cause the employee to leave employment as a result of those working conditions *or* knew that the employee was certain, or substantially certain, to leave employment as a result of those working conditions;[9] and (4) the employee did leave the employment as a result of those working conditions.

Plaintiff alleged here that, for 19 1/2 months, defendants "engaged in a course of [physical and verbal] conduct constituting a continuing pattern of sexual harassment and abuse of" plaintiff. Plaintiff also alleged that defendants "deliberately created, maintained, and permitted working conditions which defendant knew * * * would force plaintiff to resign." The foregoing allegations suffice to state a claim for constructive discharge. (As noted above, no claim is made

---

[8] The *Bratcher* opinion used the term "deliberately" in describing this element, whereas we have used the term "intentionally." We have done so because we read the *Bratcher* opinion as a whole to have meant "intentionally" in this context.

[9] This requirement means that there is no "constructive discharge" when, for example, an employee agrees to take on an objectively "intolerable" job but later quits. In that situation, it cannot fairly be said that the employer has "induce[d the] employee to resign rather than be fired." *Sheets*, 308 Or at 228.

that plaintiff's pleading failed to meet the element of "wrongfulness"; the only dispute here has been over the "discharge" element.) Therefore, the trial court erred in dismissing plaintiff's claim for wrongful discharge.

## CONCLUSION

In conclusion, the trial court's dismissal of plaintiff's claim for intentional interference with economic relations was not reversible error. The trial court's dismissal of plaintiff's claims for intentional infliction of severe emotional distress and wrongful discharge was error.

The decision of the Court of Appeals is affirmed, in part on different grounds. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.