Argued and submitted May 4, 1990, reversed April 10, reconsideration denied May 22, petition for review denied June 20, 1991 (311 Or 432)

Lourdes PETTY,
*Respondent,*

*v.*

ROGUE FEDERAL CREDIT UNION,
and Charles Baggett,
aka Chuck Baggett,
*Appellants.*

(87-672-J-3; CA A61269)

809 P2d 121

Timothy C. Gerking, Medford, argued the cause for appellants. With him on the briefs was Brophy, Wilson, Duhaime, Mills, Schmor & Gerking, Medford.

William G. Carter, Medford, argued the cause and filed the brief for respondent.

Before Joseph, Chief Judge, and Riggs and Edmonds, Judges.

RIGGS, J.

## RIGGS, J.

Plaintiff brought this claim against her former employer and supervisor for intentional infliction of emotional distress and against her supervisor only with respect to intentional interference with an economic relationship.[1] Defendants appeal the judgment entered on the jury verdict for plaintiff. We reverse.

Plaintiff, a native of Mexico, worked for Jackson County Federal Employees Federal Credit Union (Jackson) from 1967 until it merged with Rogue Federal Credit Union (Rogue) in 1982. She continued to work for Rogue until November 3, 1986. Jackson was a small credit union, and plaintiff was one of only two employees. In the other employee's absence, plaintiff was in complete charge of the office. Plaintiff performed those duties satisfactorily. She received generally favorable performance evaluations throughout her employment with Jackson and also during her employment with Rogue, until 1986. Rogue was a larger credit union than Jackson and had branch offices and various departments. In 1983, plaintiff's supervisors at Rogue perceived that she was having difficulty communicating effectively with customers on the telephone, due to her accent. Rogue created a file clerk position for her in order to prevent her from having to communicate with customers. Sometime after the merger with Rogue, fellow employees heard Rogue's executive vice president make derogatory comments about plaintiff's ethnic background and physical size.

In 1984, defendant Baggett became plaintiff's immediate supervisor. He evaluated her performance in 1985 and indicated that she met the standards in every category. In 1986, Rogue opened a new branch office and transferred plaintiff to it. The file clerk position was eliminated, because the files were divided among the branches and there was not enough filing at any one branch to support a full-time file clerk. Other behind-the-scenes employees were also reassigned to positions that involved dealing with customers of the credit union. Plaintiff was transferred to the new branch as a

---

[1] Plaintiff's claims for discrimination based on physical or mental handicap and unlawful employment practices are not at issue on appeal.

telephone receptionist. Baggett knew that plaintiff had difficulty communicating with people, especially over the telephone, and that the new position would be very difficult for her. Her previous supervisor felt that being in the new position would almost guarantee her failure.

Immediately after the transfer, plaintiff began experiencing difficulties, especially relating to customer complaints that she was hard to understand because of her accent. She had six to eight meetings with Baggett regarding her job performance between February and August, 1986. Most of the meetings focused on her communication problems. On August 5, Baggett gave plaintiff a 90-day warning notice and told her that, if she did not improve her job performance by the end of that time, she would be terminated. She was given the option to improve her performance, quit or be fired. Baggett did not offer suggestions for how to improve nor did he set up a work plan to help with her performance problems. There were no further meetings, and she was terminated on November 3, 1986.

Plaintiff brought this action for intentional infliction of emotional distress and interference with an economic relationship. The jury returned a verdict for plaintiff on both claims. Defendants assert five assignments of error. Because of our disposition on the other assignments, we do not address the first or fifth.

■ Defendants assign error to the trial court's denial of their motions for directed verdict on both claims.[2] We review the evidence in the light most favorable to plaintiff and will not reverse the denial of a motion for directed verdict unless there is no evidence from which the jury could have found the necessary facts. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984).

■ To make out a claim for intentional infliction of emotional distress, a plaintiff must prove

"that (1) defendant intended to inflict severe emotional distress on plaintiff, (2) defendant's acts did in fact cause plaintiff to suffer severe emotional distress, and (3) defendant's

---

[2] Defendants also assigned error to the trial court's denial of their motions for judgment notwithstanding the verdict. Denial of a motion for judgment notwithstanding the verdict is not reviewable when it is based on insufficiency of the evidence. *Burke v. American Network, Inc.*, 95 Or App 274, 277, 768 P2d 924 (1989).

acts consisted of 'some extraordinary transgression of the bounds of socially tolerable conduct.' " *Lewis v. Oregon Beauty Supply Co.,* 302 Or 616, 626, 733 P2d 430 (1987) (*quoting Hall v. The May Dept. Stores,* 292 Or 131, 135, 637 P2d 126 (1981)).

Defendants argue that their conduct did not transgress the bounds of socially tolerable conduct, because it was not "outrageous in the extreme." *See Patton v. J. C. Penney Co.,* 301 Or 117, 124, 719 P2d 854 (1986). In considering the outrageousness of the conduct, we look at the purpose of the conduct and the means used to achieve the result. 301 Or at 123.

■     Plaintiff presented evidence that she had been a competent employee of Rogue and its predecessor for 19 years. The job was a very important part of her life, and she had no other financial resources. Defendants knew that plaintiff had difficulty communicating with customers because of her accent, and they created a file clerk position for her to shield her from customer contact. After the merger with Rogue, its vice president made derogatory comments about plaintiff's ethnic background and physical size.

Despite defendants' knowledge of plaintiff's communication problems, they intentionally assigned her to a position as "number one telephone receptionist," which meant that her primary responsibility was to communicate with customers, either by telephone or in person, even though there were other jobs not involving customer contact that she could have performed. They knew that the assignment would almost guarantee her failure. They began keeping a "close record" of complaints about her. Numerous complaints were documented. Plaintiff was called to Baggett's office on several occasions and told that she was not performing satisfactorily, primarily because of her accent. Neither Baggett nor any other employee gave any suggestions for how she could improve the situation. Plaintiff took the initiative to take an English as a Second Language class in the hope of improving her language skills. Her requests to be moved to a position that did not involve the areas in which she was having problems were denied. Finally, defendants fired her.

Ordinarily, "[t]he act of discharging an employee * * * will not constitute conduct outrageous enough to support a

claim for intentional infliction of emotional distress." *Madani v. Kendall Ford, Inc.,* 102 Or App 478, 482, 794 P2d 1250, *rev allowed* 310 Or 475 (1990). The evidence, viewed in the light most favorable to plaintiff, is that, after plaintiff had performed competently for 19 years, defendants intentionally assigned her to a position in which, because of her accent, she would almost certainly fail and that they supervised her excessively and were overly zealous in documenting complaints. We said in *Snyder v. Sunshine Dairy,* 87 Or App 215, 218, 742 P2d 57 (1987), that excessive supervision and unjustified reprimands cannot amount to an *extraordinary* transgression of the bounds of socially tolerable conduct. Similarly, assigning plaintiff to a position that guaranteed her failure, is not sufficient, without more, *see Hall v. The May Dept. Stores, supra,* 292 Or at 139, even if a jury could find that defendants engaged in a pattern of conduct whereby they set her up to fail. There was no evidence of abusive tactics, either physical or verbal, of false accusations, threats or even raised voices. Although we cannot condone defendants' conduct, it did not rise to the level necessary to support a finding of intentional infliction of emotional distress.

█  We also conclude that plaintiff did not prove her claim for intentional interference with an economic relationship. In order to make out that claim, plaintiff had to prove that defendant Baggett interfered with her contractual relations, causing her damage, and that that interference was

> "wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Top Service Body Shop v. Allstate Ins. Co.,* 283 Or 201, 209, 582 P2d 1365 (1978). (Footnote omitted.)

A plaintiff must prove not only that the defendant intentionally interfered, but also that the defendant interfered for an improper purpose or used improper means. *Straube v. Larson,* 287 Or 357, 361, 600 P2d 371 (1979).

Baggett argues that there was no evidence to support a finding of improper motive or improper means and that his actions toward plaintiff were privileged. He asserts that the

evidence was unrebutted that he acted with the knowledge and approval of his supervisors and decided to terminate plaintiff because he felt it was in the best interest of the credit union.

Plaintiff argues that she alleged that defendant interfered for an improper motive and by improper means and that the cases on which Baggett relies for his privilege argument deal only with improper motives. Further, she asserts that "[t]he evidence * * * clearly provided a basis upon which the jury could have found that * * * Baggett engaged in bad faith motives and/or improper means, as required to establish the tort."

■■■■ An employee who acts within the scope of his authority and for the benefit of the employer is not liable for intentionally causing the employer to breach a contract. *Welch v. Bancorp Management Services,* 296 Or 208, 215, 675 P2d 172 (1983). Although plaintiff asserts generally that there was evidence that Baggett was acting other than on behalf of the credit union, she does not point to any specific evidence. We have carefully reviewed plaintiff's brief for references to evidence on which the jury could have relied to find that Baggett was acting for an improper purpose and not to further his employer's interests.

There is evidence that Baggett was a member of a leadership team that decided to transfer plaintiff to the telephone receptionist position. He was instructed to keep track of all complaints received about her performance, and he did. He knew that assigning plaintiff to the new position would cause her difficulties; he did not offer any suggestions in his numerous meetings with her of ways to improve her performance. He told her on numerous occasions that the main problem was her accent. There is nothing in that evidence from which a jury could reasonably conclude that Baggett was acting outside the scope of his authority and for a personal, improper motive, rather than for the benefit of his employer. It was plaintiff's burden to establish the impropriety of the motive; she failed to do so.

■■■■ Plaintiff asserts that Baggett's conduct is not privileged, even if he acted for the benefit of the credit union and within the scope of his employment, because he employed improper means. She relies on the language in *Top Service Body Shop v. Allstate Ins. Co., supra,* that

"even when defendant's objectives are not improper, for instance the pursuit of competition or other legitimate interests, defendant may still be liable for using improper means to achieve these objectives." 283 Or at 209.

She contends that the privilege goes only to the improper motive element and is inapplicable to a claim based on improper means. Baggett argues that, if his conduct was privileged, he cannot be held liable even for using improper means.

The trial court instructed the jury only on the improper purpose theory; it did not instruct the jury to consider improper means. Plaintiff did not except to the instruction and we will not consider it now. *Frank v. Fitz Enterprises, Inc.,* 106 Or App 183, 186, 806 P2d 720 (1991).

Reversed.