Laurie VOLM, Plaintiff,

v.

LEGACY HEALTH SYSTEM, INC., an Oregon non-profit corporation, Legacy Meridian Park Hospital, an Oregon non-profit corporation, Women's Healthcare Associates, LLC, an Oregon limited liability corporation, dba Lake Grove Women's Clinic, Jeff Cushing, Harold Vick, M.D., Stephen G. Girolami, M.D., Terry Joyer, Lusanne Wisecaver, and Paula Stuart, as individuals, Defendants.

No. CIV.00–1168–KI.

United States District Court, D. Oregon.

March 7, 2002.

Craig A. Crispin, Shelley D. Russell, Crispin & Associates, Portland, OR, for Plaintiff.

Robert D. Newell, John F. McGrory, Patricia L. McGuire, Davis Wright Tremaine, LLP, Portland, OR, for Defendants.

## OPINION

KING, District Judge.

Plaintiff Laurie Volm is a lactation consultant who worked with new mothers at defendant Legacy Meridian Park Hospital ("Meridian Park"). Volm's relationship with Meridian Park deteriorated until Legacy Health System ("Legacy") banned Volm from treating patients at any of its facilities, including Meridian Park, where Volm saw most of her patients. Volm alleges that defendants opposed her presence at Meridian Park because she offered a competing service to the lactation consultants employed by the hospital. Before the court is defendants' motion for summary judgment (# 65). For the reasons below, I grant summary judgment against all claims except intentional interference with economic relations or prospective economic relations.

## FACTS

Because of the number of witnesses, I'll list the occupations of some of them [1]: (1) Patty Moxley, office manager at the Women's Clinic; (2) Dr. Daniel Schrinsky, physician at the Women's Clinic; (3) Dr. Audrey Unrau, physician at the Children's Clinic; (4) Teri Joyer, director of women's services for Legacy; (5) Dr. Stephen Girolami, head of Meridian Park's OB–GYN department through the end of 1998 and physician at the Women's Clinic; (6) Dr. Harold Vick, head of Meridian Park's OB–GYN department beginning January 1, 1999, and physician at the Women's Clinic; (7) Lusanne Wisecaver, head nurse at Meridian Park's Family Birth Center; (8) Margie Munson, Meridian Park lactation consultant; and (9) Dr. Allard Conger, physician at the Women's Clinic.

Volm began working as a lactation consultant employee at the Women's Clinic in 1994. She became an independent contractor for the Women's Clinic in March 1998 in part because of tension between Volm and Moxley. The physicians eventually asked Moxley to leave the clinic. Approximately 90% of Volm's practice was at Meridian Park where she saw clients of the Women's Clinic after they gave birth. Meridian Park also has lactation consultants on its staff and charges for their services that are considered complex, rather than routine, bedside care. Because of Legacy's contracts with insurers which reimburse at flat rates, it is unclear if Meridian Park is paid for these charges when assessed against insured patients.

At first, Legacy did not require any type of privilege for Volm to treat patients at Meridian Park. When it changed its policy, Dr. Schrinsky, of the Women's Clinic, was credentialed to supervise Volm at Meridian Park beginning in October 1998. Either Volm or Dr. Schrinsky could end the arrangement at any time.

Volm and the Meridian Park lactation consultants used different methods. This caused some confusion with patients and regular nursing staff, although Volm does not believe that the differences were large or problematic. Dr. Vick believes that the Family Birth Unit became polarized over the issue.

Volm met with Dr. Girolami and Wisecaver on December 16, 1998. Dr. Girolami sent Volm a letter memorializing the discussion. The letter states that Volm would maintain a professional image on the Family Birth Unit, be sensitive to socializing and use of phones at the nurses' station, wear a name tag, only see patients of the Women's Clinic unless other physicians

---

1. The people are listed in no particular order. All of the physicians have privileges to prac- tice at Meridian Park.

are credentialed to supervise her, stay within the scope of her responsibilities as a lactation specialist, and meet with a group to draft a plan to improve teamwork.

Many negative statements were made concerning Volm. Meridian Park staff nurses told two physicians at the Children's Clinic that Volm does not spend enough time with her patients and does not do the things she claims to have done. Legacy staff nurses or lactation consultants told a patient in a follow-up call after she left the hospital that she should not see Volm. Meridian Park nursing staff told patients to see their lactation consultants instead of Volm because their services were better. Joyer told a physician at the Children's Clinic that the doctors there were referring patients to Volm because Volm was "filling the doctors' heads" with information about Meridian Park lactation services.

Drs. Vick and Girolami told the Women's Clinic that the problem is Volm's fault and that she needs to fix it. Dr. Vick met with the pediatricians at the Children's Clinic and told them that the problem was Volm's responsibility. He asked them to find a way to keep Volm out of the birth unit at Meridian Park and have her see patients outside the hospital only. Dr. Vick asked his partners at the Women's Clinic to stop referring patients to the Children's Clinic. Dr. Vick asked Dr. Conger to talk to Volm about altering her practice so that she was not at Meridian Park. Dr. Vick asked his partners at the Women's Clinic to remove Volm's brochures from the clinic's office and not to support Volm.

Margie Munson told Dr. Conger at the Women's Clinic that Volm's methods were going to get them sued. Wisecaver told Dr. Conger that she wanted his help to get Volm removed from Meridian Park because Volm's different style was causing confusion with the nursing staff. Wisecaver told Dr. Conger that Volm had "sucked" him and Dr. Unrau in to promote her.

In July 1999, Dr. Unrau of the Children's Clinic, applied to be a supervising physician of Volm so Volm could see newborn patients of the Children's Clinic whose mothers were not patients of the Women's Clinic. In the case of dependent allied health professionals, such as Volm, a doctor's privilege is extended to allow supervision of the professional. Consequently, a separate approval process is needed for each group of partnered doctors who work with Volm. This application was delayed by Legacy's need to develop a credentialing procedure for lactation specialists, and the length of time it took an outside company to verify information from third parties.

After additional problems, Volm stopped making daily rounds on all Women's Clinic patients as of October 16, 1999, and only went to Meridian Park when a client requested her services.

On January 20, 2000, Dr. Vick sent Volm a letter advising her that some of her conduct was inappropriate and unacceptable. In particular, Dr. Vick stated that problems of teamwork, collaboration, and attempts to practice outside the parameters of Volm's position caused disharmony and confusion affecting patient care and satisfaction.

In February 2000, Dr. Schrinsky told Volm that he was withdrawing his supervision of her, effective March 10, 2000. Her interpersonal difficulties in the workplace were very difficult and tedious for Dr. Schrinsky and he did not want to devote more time to her situation. Dr. Unrau's application was not yet approved. In defendants' view, Volm could not see patients at Meridian Park in any manner because she lacked a supervisor. Volm thought she could continue to provide lactation services at Meridian Park if she refrained

from charting, as was the standard prior to Legacy requiring a physician's privilege to cover Volm. She continued to see patients at Meridian Park on this basis.

In a letter dated April 6, 2000, Dr. Girolami sent Volm a letter on behalf of Legacy. It stated that Volm was providing lactation services at Meridian Park after Dr. Schrinsky terminated his supervision of Volm and banned Volm from all Legacy facilities unless she was there to receive emergency medical care. The Women's Clinic is on Legacy property at Meridian Park so Volm could no longer see patients or teach classes at the clinic either. On August 22, 2000, the Legacy Medical Quality and Credentialing Committee informed Dr. Unrau that it was recommending that the Legacy Board of Directors deny her request for privileges to use the services of Volm. The Board eventually did so. Volm now practices at Providence St. Vincent Hospital under the privilege of Dr. Unrau.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. *Robi v. Reed*, 173 F.3d 736, 739 (9th Cir.), *cert. denied*, 528 U.S. 952, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999).

## DISCUSSION

I. *Antitrust Claims*

A. *Sherman Act*

The Sherman Act states:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

15 U.S.C. § 1. Section 4 of the Clayton Act makes available treble damages to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15.

■ Defendants contend that Volm lacks standing to bring antitrust claims because there has been no antitrust injury. They argue that injury to Volm, as a competitor, is not injury to competition, which is what the antitrust laws protect. Defendants note that Volm still sees patients at locations outside the Legacy system.

Volm contends that she has standing to bring antitrust claims. She argues that competition is protected by protecting her from a conspiracy whose sole purpose was to eliminate her and thus decrease competition among lactation service providers within Meridian Park.

■ Private plaintiffs cannot recover under § 4 of the Clayton Act by showing an injury causally linked to an illegal presence in the market. The plaintiff must prove an antitrust injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (internal quotation omitted). The injury must be "attributable to an anticompetitive aspect of the practice under scrutiny." *Id.*

Two cases are instructive. In *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), a New Orleans hospital refused to grant privileges to Hyde, an anesthesiologist, because it had an exclusive contract with Roux, a group of four anesthesiologists in practice together. No other anesthesiologists were allowed to practice at the hospital, even if a patient or surgeon made such a request. The hospital was used by 30% of the patients in Jefferson Parish.

The Court analyzed the situation as a tying arrangement with surgical services as the tying product and anesthesiological services as the tied product. The essential characteristic of an invalid tying arrangement "lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.* at 12, 104 S.Ct. 1551. Tying arrangements are only unlawful if the seller has the "market power" to force a purchaser to do something that he would not do in a competitive market. *Id.* at 13–14, 104 S.Ct. 1551. Per se condemnation of a tying arrangement is only appropriate if the existence of forcing is probable. *Id.* at 15, 104 S.Ct. 1551. The Court concluded that the hospital did not have sufficient market power to apply the per se rule against tying.

If there is no per se liability, a tying arrangement does not violate the Sherman Act unless it restrains competition. The Court proceeded to an inquiry into the actual effect of the exclusive contract on competition among anesthesiologists. *Id.* at 29, 104 S.Ct. 1551. The court concluded the evidence did not show that the market as a whole was affected by the exclusive contract, even though Hyde and others were required to practice elsewhere. The Court noted that patients or surgeons who wanted to use an anesthesiologist outside of the Roux group could go to another hospital. Consequently, the hospital did not violate § 1 of the Sherman Act. *Id.* at 29–32, 104 S.Ct. 1551.

I realize the situation before me is not strictly a tying arrangement because new mothers are not required to purchase lactation consultant services if they are not having difficulties that the staff nurses are unable to resolve. The Court's discussion of the effect on the competition in the market, however, along with the similarity of the facts, make *Jefferson Parish* very helpful.

In *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404 (9th Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991), a certified registered nurse anesthetist ("CRNA") practiced for several years at Manteca Hospital, located in a small town but within a thirty minute drive of at least five other hospitals. The hospital implemented a policy requiring anesthesiological services to be performed only by physicians, resulting in the CRNA being unable to practice any longer. He alleged a claim under § 1 of the Sherman Act. The court first held that the boycott of CRNA providers was not a per se violation. *Id.* at 1412. The court then applied a rule of reason analysis on whether the practice is unreasonable on balance after considering the anti-competitive effects along with any pro-competitive effects. *Id.* at 1413. The plaintiff has the burden of showing that the activity is the type that restrains trade and that the restraint is likely to be of significant magnitude. Typically, the plaintiff must delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly. *Id.* at 1413.

The court granted summary judgment, holding that the CRNA failed to show a

substantial restraint on competition in a relevant market. "The only actual effect shown is that one nurse anesthetist no longer works at one hospital. This alone is not enough to demonstrate actual detrimental effects on competition." *Id.* at 1413–14.

Volm does not argue that defendants have committed a per se violation of § 1 of the Sherman Act. She also does not provide a market analysis and appears to restrict the relevant market either to Meridian Park or to all hospitals in the Legacy system. I do not think this restricted view of the relevant market is realistic. As in *Jefferson Parish*, there are numerous other hospitals in the Portland area in which a mother can give birth. Volm practices at St. Vincent's under privileges of some of the same doctors who practice at Meridian Park. There is no evidence that she could not have obtained permission to practice in numerous hospitals. As in *Jefferson Parish*, if a patient felt strongly enough about using Volm's services, she could have asked her doctor to attend to the birth at a different hospital.

I reviewed the cases on which Volm relies. *Angelico v. Lehigh Valley Hospital, Inc.*, 184 F.3d 268 (3rd Cir.1999), is distinguishable because defendants prevented the plaintiff, a surgeon, from practicing at any of the hospitals in the geographic area. Thus, he was completely shut of the market. *Yellow Pages Cost Consultants v. GTE Directories*, 951 F.2d 1158 (9th Cir.1991), *cert. denied*, 504 U.S. 913, 112 S.Ct. 1947, 118 L.Ed.2d 552 (1992) is similar. Plaintiffs offered advice on effective and cost efficient yellow pages advertising, generally recommending packages which are less expensive than those offered by GTE directly. Although plaintiffs could continue designing ads, GTE started refusing to take orders directly from them, causing many of the plaintiffs' clients to cancel their services because of the added inconvenience. Plaintiffs were shut out of the market in the placement of the ads. This is not the case with Volm. She can and does practice in other hospitals in Portland.

I conclude that Volm has not raised a factual issue that she has suffered an antitrust injury of the type required for standing. I grant summary judgment against the Sherman Act claim.

## B. *Oregon's Antitrust Act*

■ To the extent that the state antitrust claim overlaps the federal claim, the analysis is identical, ORS 646.715(2) ("decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority"), and summary judgment is granted against the state claim. Volm also alleges a claim for monopolization under ORS 646.730. She contends that defendants engaged in illegal predatory conduct which resulted in an increase in consultations and product sales for Legacy lactation services and a corresponding decrease in consultations, product sales, and class size for her business.

■ A monopolization claim requires proof of: (1) possession of monopoly power in a relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury. *Nugget Hydroelectric v. Pacific Gas and Electric*, 981 F.2d 429, 436 (9th Cir.1992), *cert. denied*, 508 U.S. 908, 113 S.Ct. 2336, 124 L.Ed.2d 247 (1993).

Volm's monopolization claim fails for the same reason as the Sherman Act claim. The relevant market is composed of all hospitals in Portland, not just within the Legacy system. There is no proof that defendants have control of lactation services in this entire market. Summary judgment is granted against the state antitrust claim.

## II. *Unlawful Trade Practices Act*

██ Volm alleges that defendants violated the Oregon Unlawful Trade Practices Act ("UTPA"), ORS 646.605 *et seq.*, by disparaging her business to physicians and clients with the intent of destroying her ability to compete with Meridian Park lactation consultants.

Defendants contend that the UTPA was intended to provide a cause of action only to consumers, not businesses. Defendants admit that the text of the statute supports Volm's claim but that case law and legislative history make it clear that a cause of action does not lie for a business. Thus, defendants contend that judgment must be granted against Volm's UTPA claim.

The UTPA states:

> A person engages in an unlawful practice when in the course of the person's business ... the person ... [d]isparages the goods, services, property or business of a customer or another by false or misleading representations of fact.
> ORS 646.608(1)(h).

> [A]ny person who suffers any ascertainable loss of money ...as a result of willful use or employment by another person of a method, act or practice declared unlawful by ORS 646.608, may bring an individual action in an appropriate court ....

ORS 646.638(1). "Person" includes natural persons, corporations, partnerships, etc. ORS 646.605(4).

I earlier ruled against defendants' argument when deciding their motion to dismiss. I held that Volm stated a claim under the UTPA, reasoning:

> By its express terms, this section of the UTPA does appear to protect the business of another, such as Volm. The act's primary purpose of consumer protection is apparently fulfilled by reducing incorrect information which may confuse the decisions of consumers when they choose a vendor or service provider.

Opinion and Order at 3, Dec. 5, 2000. Volm urges me to stay with my earlier decision.

Judge Janice Stewart recently reviewed the case law and legislative history of the UTPA in *CollegeNET, Inc. v. EMBARK.COM, INC.*, CV00–981–ST, Findings and Recommendation ("F & R"), December 15, 2000. She determined that courts interpreting the statute "have almost uniformly recognized that it is first and foremost a consumer protection statute." F & R at 9. When the UTPA was enacted, language concerning unfair methods of competition was deleted because the bill sought to protect consumers rather than businesses. She dismissed plaintiff's claim because plaintiff did not allege that it was a consumer of defendant's products or services. F & R at 12. Based on Judge Stewart's lengthy analysis, I change my earlier position and adopt her reasoning.

Here, Volm does not allege that she is a consumer of any products or services of defendants. There is evidence that the Women's Clinic provided Volm with liability insurance, referrals, and space in which to hold classes, but these are not typical services of that clinic. The weight of her claim is for anti-competition, which is not protected by this statute. Accordingly, I grant summary judgment against Volm's UTPA claim.

## III. *Intentional Interference with Economic Relations and Prospective Economic Relations*

██ Volm alleges that defendants used false accusations to discourage competition, resulting in denying Volm access to her patients and damaging the relationship between Volm and her employer. Volm also alleges that defendants interfered with her contracts with the Women's Clinic and the Children's Clinic by causing Dr. Schrinsky to terminate his supervision, by refusing to grant her privileges, and by

contacting the Children's Clinic to spread false information about plaintiff without a legitimate business purpose but instead to remove competition with Legacy lactation consultants.

Defendants contend that they are not third parties interfering with Volm's economic relations, they did not accomplish the alleged interference through improper means or an improper purpose, and that Volm cannot establish that they were not privileged to interfere. In her brief, Volm clarifies that the contractual relationship at issue is her agreement with the Women's Clinic and Dr. Schrinsky to provide lactation consulting services for Women's Clinic patients in exchange for referrals and space to see the patients. The business relationships at issue are between Volm and the Children's Clinic, and Volm and her patients. There is sufficient evidence to raise a factual issue that these relationships existed.

 The elements of the torts of intentional interference with economic relations are: (1) the existence of a professional or business relationship, which could be a contract or a prospective economic advantage; (2) intentional interference with the relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relationship; and (6) damages. *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995).

 If liability is based on an improper purpose, the purpose must be to inflict injury on the plaintiff "as such." *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 498, 982 P.2d 1117 (1999) (internal quotation omitted). If liability is based on improper means, the means must violate "some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common

law, or perhaps, an established standard of a trade or profession." *Id.*

There is evidence in the record that, among other things: (1) Meridian Park staff nurses made negative comments about Volm to her patient and to physicians at the Children's Clinic; (2) Joyer told a physician at the Children's Clinic that Volm was "filling their heads," presumably with incorrect information; (3) Dr. Vick asked his partners to stop referring patients to the Children's Clinic. In context, Volm has raised a factual issue that defendants used improper means, misrepresentation, for an improper purpose, to inflict economic injury on Volm, which is sufficient to survive summary judgment. I realize that competitors have a privilege to compete but I believe Volm has raised a factual issue that defendants went beyond this privilege.

I considered whether it was possible to dismiss a few of the defendants from this claim. Due to the number of defendants, and the fact that the physicians are agents of multiple entities, I think the more prudent course is to deny the motion for summary judgment against this claim in its entirety. I caution the parties, however, that unless there is a stipulation between them or I dismiss some defendants in a motion for judgment as a matter of law, I will require the jury to make a separate finding on this claim for each defendant.

IV. *Breach of the Duty of Good Faith and Fair Dealing*

 Volm contends that she had a contract with the Women's Clinic. The details of the oral contract are not clear but I'll assume for this motion that the Women's Clinic agreed to refer patients to Volm and provided her with space and liability insurance in exchange for Volm teaching classes and consulting with individual patients. Either party could end the arrangement at any time.

Every contract contains an implied duty of good faith. *Uptown Heights Associates v. Seafirst Corp.*, 320 Or. 638, 645, 891 P.2d 639 (1995). The duty is applied in a manner to effectuate the objectively reasonable contractual expectations of the parties. The duty of good faith cannot serve to contradict express contractual terms, even for "an unpleasantly motivated act that is expressly permitted by contract." *Id.* (internal quotation omitted).

Taken in a light most favorable to Volm, Drs. Vick, Girolami, and Schrinsky caused the Women's Clinic to terminate its contract with Volm. Whatever their motivation, the contract had no term and could be ended at any time. The Women's Clinic exercised this term of the contract. Accordingly, it did not breach the duty of good faith and fair dealing.

Volm also contends that she is a third-party creditor beneficiary of Dr. Schrinsky's contract with Meridian Park for privileges to practice there, including the extension of his privilege to allow supervision of Volm when she practices on Meridian Park premises.

Assuming without deciding that Volm is a third-party beneficiary to Dr. Schrinsky's contract, the claim fails. Meridian Park did not withdraw this extension of Dr. Schrinsky's privilege. Dr. Schrinsky could end his arrangement with Volm at any time. He did so with a few weeks warning, taking advantage of this contractual term in the same way the Women's Clinic terminated its contract with Volm.

Summary judgment is granted against the claim for breach of the duty of good faith and fair dealing.

## V. *Defamation*

Volm contends that the following five oral statements made by various defen-
dants are defamatory per se. The patients raised their concerns that Volm could not visit them at Meridian Park after they gave birth. The first four statements were made by the Meridian Park employees during conversations in response.

1. Would you want to go to a hospital where they did not thoroughly check out the people who would be administering medical care to you? (made by Wisecaver[2] to Saab, a Meridian Park patient)

2. Volm's privileges expired and her supervising physician chose not to renew them. (made by Cushing to Wilson, a Meridian Park patient)

3. Volm's supervising physician decided not to support her and we really don't know why. (made by Joyer to Aaberg, a Meridian Park patient)

4. Volm has not gone through the procedure to obtain privileges. (made by Wisecaver to Saab, a Meridian Park patient)

5. Volm will not get privileges here. (Dr. Braddock to either Dr. Nichols or Dr. Richman)

### A. *Statements Published by Others*

Defendants raise the following arguments against one or more of the statements: (1) the statement is not capable of defamatory meaning; (2) the statement is true; (3) the statement is not an assertion of fact; (4) the statement is protected by a qualified privilege; and (5) lack of evidence of publication. Volm contends that the statements to patients tend to imply that she was engaged in some wrongdoing in her business warranting the withdrawal of supervision and the inability to obtain credentials at Meridian Park.

"A defamatory communication is one that would subject another to ha-

---

**2.** None of the defendants admits making the statements attributed to them but, for pur-
poses of this motion, I will assume that the statements were made.

tred, contempt or ridicule [or] tend to diminish the esteem, respect, goodwill or confidence in which [the other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the other]." *Reesman v. Highfill*, 327 Or. 597, 603, 965 P.2d 1030 (1998) (internal quotation omitted). A statement must be both false and defamatory to be actionable. The court determines whether a statement is capable of a defamatory meaning in context. Even if a statement is not defamatory on its face, it is defamatory if a reasonable person could draw a defamatory inference from it. The link between the defamatory inference and the statement must not be too tenuous. *Id.* at 603–04, 965 P.2d 1030.

4. *Volm has not gone through the procedure to obtain privileges.* (made by Wisecaver to Saab, a Meridian Park patient)

5. *Volm will not get privileges here.* (Dr. Braddock to either Dr. Nichols or Dr. Richman)

■■ I conclude that the fourth and fifth statements are not capable of defamatory meaning. The statement that Volm has not gone through the procedure to obtain privileges could be made about the majority of lactation consultants in Portland and does not imply that they are all incompetent. It is a neutral statement. Likewise, the fifth statement does not say why Volm will not get privileges. The inference that the unstated explanation is incompetence or wrongdoing is an unreasonable one.

■■ Truth is a complete defense to defamation. *Bahr v. Statesman Journal*, 51 Or.App. 177, 180, 624 P.2d 664 (1981), *rev. denied*, 291 Or. 118, 631 P.2d 341 (1981). A statement is true or substantially true if the "gist" or "sting" is true, even if the statement contains slight inaccuracies. *Hickey v. Settlemier*, 116 Or.App.

436, 440, 841 P.2d 675 (1992), *aff'd in part and rev'd in part on other grounds*, 318 Or. 196, 864 P.2d 372 (1993). Moreover, a statement is not actionable unless a reasonable factfinder could conclude that it implies an assertion of objective fact. *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir.1990), *cert. denied*, 499 U.S. 961, 111 S.Ct. 1586, 113 L.Ed.2d 650 (1991). To make that determination, three factors are analyzed: (1) whether the statement used figurative or hyperbolic language that would negate the impression that the speaker was seriously maintaining the content of the statement; (2) whether the general tenor of the statement in context negate that impression; and (3) whether the statement can be proven true or false. *Id.*

1. *Would you want to go to a hospital where they did not thoroughly check out the people who would be administering medical care to you?* (made by Wisecaver to Saab, a Meridian Park patient)

■■ I conclude that a reasonable factfinder could not determine that the first statement is an assertion of objective fact. The statement is in the form of a rhetorical question and is not capable of being proven true or false. If anything, the statement asserts a fact about Meridian Park, not about Volm. Accordingly, the first statement is not actionable.

2. *Volm's privileges expired and her supervising physician chose not to renew them.* (made by Cushing to Wilson, a Meridian Park patient)

■■ I also conclude that the second statement is not actionable. There are a few points which are not absolutely accurate: (1) the privilege for Volm to practice belonged to Dr. Schrinsky and not to Volm; (2) the privilege did not expire because it did not have a term attached to it; and (3) Dr. Schrinsky withdrew his supervision rather than refraining from

renewing something requiring renewal on a periodic basis. Even in light of those inaccuracies, I conclude that there is no factual issue that the statement is substantially true because the gist of the statement is true.

3. *Volm's supervising physician decided not to support her and we really don't know why.* (made by Joyer to Aaberg, a Meridian Park patient)

■ Finally, I conclude that the third statement is not actionable. The first portion of it is true, as I stated above. There is no evidence that Joyer knew why Dr. Schrinsky was withdrawing his supervision from Volm. Joyer did not learn of the decision from Dr. Schrinsky.

Summary judgment is granted against the defamation claim for these five statements.

### B. *Self–Published Statements*

Volm alleges that after she received the letter of April 6, 2000, banning her from Legacy facilities, she was compelled and had a duty to disclose the contents of the letter to prospective employers and patients.

Defendants argue that the Oregon Supreme Court has declined to rule on whether it would recognize the doctrine of compelled self-publication of defamatory statements. *Downs v. Waremart, Inc.,* 324 Or. 307, 926 P.2d 314 (1996). In 1997, the legislature adopted ORS 30.178(2) which prohibits compelled self-publication claims brought by former employees. Although the statute would not apply to Volm's claim, defendants contend that it responded to *Downs,* which was in the employment context, so the statute effectively prevents the recognition of self-publication claims in any context.

In summary, defendants contend that this court should not extend Oregon law by recognizing a claim for compelled self-pub-

lication. Alternatively, defendants contend that the letter `is not defamatory, that it was not reasonably foreseeable that Volm would be under a strong compulsion to disclose the contents of the letter, that Volm has not presented any evidence that she was under a strong compulsion to disclose, and that there is no evidence of damage.

■ Although I do not necessarily agree with defendants' interpretation of ORS 30.178(2), I find it persuasive that *Downs* decided to "leave for another day the decision whether to recognize the doctrine of compelled self-publication" since plaintiff had not alleged that she published the defamatory statement to a third party. *Id.* at 314. *Downs* also surveyed the trends in 1996, noting that about half of the fourteen state appellate courts to address the issue had recognized the doctrine but that in some of those jurisdictions recognizing the doctrine, later cases or legislation had narrowed or eliminated its application. *Id.* at 312 n. 6, 926 P.2d 314. There is nothing in *Downs* to persuade me that the Oregon Supreme Court would recognize the doctrine if faced with the question today. Consequently, I am unwilling to extend the common law tort. Summary judgment is granted against Volm's compelled self-publication claim.

### VI. *Intentional Infliction of Emotional Distress*

Volm contends that defendants set out to destroy her career, causing her severe emotional distress evidenced by sleeplessness, nausea, and headaches.

■ The tort of intentional infliction of emotional distress contains the following elements:

(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts consti-

tuted an extraordinary transgression of the bounds of socially tolerable conduct. *McGanty v. Staudenraus,* 321 Or. 532, 543, 901 P.2d 841 (1995). Intent is defined to mean "where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct." *Id.* at 550, 901 P.2d 841 (emphasis omitted). The nature of the relationship between the parties affects the type of conduct that is considered actionable. *Id.* at 548, 901 P.2d 841.

■■■■ "Conduct that is merely rude, boorish, tyrannical, churlish and mean [is insufficient to be actionable, and] ... insults, harsh or intimidating words, or rude behavior ordinarily [do not] result in liability even when intended to cause distress." *Watte v. Edgar Maeyens, Jr.,* 112 Or.App. 234, 239, 828 P.2d 479, 481 (1992), *rev. denied,* 314 Or. 176, 836 P.2d 1345 (1992) (quoting *Hall v. The May Dept. Stores,* 292 Or. 131, 135, 637 P.2d 126, 129 (1981)). In addition, Oregon cases which have allowed claims for intentional infliction of emotional distress to proceed typically involve acts of psychological and physical intimidation, racism, or sexual harassment. *See Kraemer v. Harding,* 159 Or.App. 90, 976 P.2d 1160 (continued accusations that a school bus driver was a child sex abuser after multiple investigations concluded that no inappropriate conduct occurred), *rev. denied,* 329 Or. 357, 994 P.2d 124 (1999); *Wheeler v. Marathon Printing, Inc.,* 157 Or.App. 290, 974 P.2d 207 (1998) (co-worker continued harassment including sexual remarks even after plaintiff attempted suicide); *Lathrope–Olson v. Oregon Dept. of Transportation,* 128 Or.App. 405, 408, 876 P.2d 345 (1994) (calling a Native American woman a squaw, telling her that a squaw was supposed to walk behind her man, stating that all women were good for was between their legs, locking her out of the work van in the rain and snow, and threatening to push her into the path of oncoming vehicles); *Mains v. II Morrow, Inc.,* 128 Or.App. 625, 877 P.2d 88 (1994) (daily physical assaults and sexual comments by supervisor); *Franklin v. Portland Community College,* 100 Or.App. 465, 787 P.2d 489 (1990) (supervisor called an African-American male by the name "boy," issued false reprimands, shoved him, locked him in an office, and suggested that he apply elsewhere for employment).

■■■■ Whether conduct constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law. *Harris v. Pameco Corp.,* 170 Or. App. 164, 171, 12 P.3d 524 (2000).

■■■■ Volm contends that a jury could infer from the facts that defendants set out to destroy her career, intentionally encouraged a hostile atmosphere towards her at the workplace, held repeated meetings in which they blamed Volm for all problems existing at Meridian Park Family Birth Center, and leveled allegations of wrongdoing at Volm without providing her the information necessary to address them. Even assuming that the evidence proves these facts, the conduct is not sufficient to constitute an extraordinary transgression of the bounds of socially tolerable conduct. Volm's situation is similar to that in *Petty v. Rogue Federal Credit Union,* 106 Or.App. 538, 809 P.2d 121, *rev. denied,* 311 Or. 432, 812 P.2d 828 (1991). The court reversed plaintiff's jury verdict, holding that the evidence of defendants' conduct did not rise to the level necessary to support the tort. After plaintiff had performed competently for 19 years, defendants intentionally assigned her to a position in which she would almost certainly fail because of her heavy accent, supervised her excessively, and were overly zealous in documenting complaints. *Id.* at 543, 809 P.2d 121.

Summary judgment is granted against Volm's intentional infliction of emotional distress claim.

## VII. *Motion to Strike*

Defendants move to strike numerous exhibits and paragraphs from declarations filed by Volm. After reviewing the material, the information is either duplicative of evidence provided in a form neither party objects to or is nothing on which I rely or which would have changed the analysis above. Thus, the motion is moot.

## CONCLUSION

Defendants' motion for summary judgment (# 65) is granted against all claims except the claim for intentional interference with economic relations or prospective economic relations. Defendants' motion to strike (# 97) is moot.